

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:19cr43 |
| | ) | |
| v. | ) | FILED UNDER SEAL |
| | ) | |
| KENNETH R. SPIRITO, | ) | 18 U.S.C. § 666(a)(1)(A) |
| | ) | Conversion and Misapplication of Property |
| | ) | from Organization Receiving Federal Funds |
| | ) | (Counts 1 - 11) |
| Defendant. | ) | |
| | ) | 18 U.S.C. § 1957 |
| | ) | Engaging in Monetary Transactions in Property |
| | ) | Derived from Specified Unlawful Activity |
| | ) | (Counts 12-17) |
| | ) | |
| | ) | 18 U.S.C. § 1519 |
| | ) | Falsification of Records |
| | ) | in Federal Investigations |
| | ) | (Count 18) |
| | ) | |
| | ) | 18 U.S.C. §§ 981 & 982 and |
| | ) | 21 U.S.C. § 853(p) |
| | ) | Forfeiture |

## INDICTMENT

May 2019 Term - At Newport News, Virginia

### GENERAL ALLEGATIONS

A.  **The Peninsula Airport Commission**

1. The Peninsula Airport Commission (PAC) was created by the Virginia legislature for the purpose of establishing and operating the Newport News/Williamsburg International Airport (PHF or "the airport"). The PAC is responsible for the economic development and the day-to-day affairs at the airport. The PAC consists of six (6) members, four (4) of which are appointed by the City of Newport News, and (2) of which are appointed by the City of Hampton.

1

The PAC employs an Executive Director who, though not a member of the PAC, exercises powers and duties delegated by the PAC.

2. KENNETH R. SPIRITO, the defendant herein, was employed by the PAC as Executive Director during the period of January 4, 2009 through May 15, 2017. SPIRITO was hired as the Executive Director having spent several years at other airports in similar leadership positions.

3. In the capacity of Executive Director, SPIRITO was essentially the chief executive officer of the airport. Although he reported to the PAC, these members largely served in an advisory capacity and took their direction from information that SPIRITO and his staff provided.

4. At the time that SPIRITO was hired as the Executive Director in January 2009, the airport was being serviced by several airlines, with a bulk of the flights being operated by AirTran Airways (AirTran). In or about 2011, AirTran merged with Southwest Airlines (Southwest) and the newly combined airline announced in August 2011 that it would be ceasing operations out of PHF in early 2012.

5. The resulting financial impact on the airport was significant as the passenger traffic decreased by approximately 50% after the departure of AirTran. This financial impact extended to various nearby localities. As a result, SPIRITO and others at the airport began significant efforts to replace the loss of AirTran by attempting to recruit new airlines to the airport while also encouraging existing carriers to expand service.

B. People Express Airlines

6. In or about July 2011, M.M., a businessman then residing in Chesapeake, Virginia, set out to start a new low-cost airline to be based in the Hampton Roads area of Virginia called

People Express Airlines (PEX). M.M. assembled other individuals and PEX was chartered as a Delaware corporation on August 10, 2011, and issued a certificate of authority to operate in Virginia on February 28, 2012. M.M. was the initial president of PEX through in or about 2013 and remained heavily involved in the company thereafter.

7. In or about 2011, M.M. approached officials at the Norfolk International Airport (ORF) as a location to headquarter and launch PEX. M.M. also sought funding from the Virginia Economic Development Partnership (VEDP). Ultimately, both ORF and VEDP declined M.M.'s proposals and declined to commit funds or resources to PEX.

8. In or about December 2011, M.M. then approached SPIRITO with the idea of basing PEX's headquarters at PHF. SPIRITO and other officials at PHF agreed to work with M.M. and PEX and provided certain incentives in terms of office space and resources.

9. Despite the commitment from SPIRITO and PHF and their ongoing efforts to assist PEX, the company was unable to begin flight operations for a period of years based largely on a lack of necessary start-up funding. During the time period from 2011 through in or about the end of 2013, MORISI and others solicited private investments on behalf of PEX to raise the needed capital. PEX was successful in raising several million dollars from private investors, but all of these funds were spent on general operating expenses involved with the efforts to get the airline off the ground. Additionally, MORISI and other executives assigned themselves large salaries in the $100,000 - $200,000 range, which were not always paid as due.

10. As 2014 began, PEX flight operations still had not commenced and as private investments were not available, M.M. and PEX began to pursue a strategy that focused more on obtaining a public and/or community commitment of funds and/or resources that might lead to

additional private investments.

C. <u>Airport Funding</u>

11. Airports within Virginia, including PHF, receive funds from multiple sources used to maintain operations. The primary source of funds received by PHF consisted of traditional revenue streams such as landing fees, rent, and parking. The use of these airport revenues is governed by federal statute and regulation and specifically cannot be used for subsidies to airlines and/or revenue guarantees. SPIRITO was aware of the restrictions on the use of airport revenue.

12. In addition to traditional revenue, PHF received funding from several state and federal programs, which supported air service, but had limitations on the use of the funds. One of the largest non-revenue source of funds received by the airport each year consisted of State Entitlement Funds (SEF), which were paid through the Virginia Department of Aviation (DOAV). SEF are funded through the state's Transportation Trust Fund, which consists of various transportation related taxes such as the aviation fuel tax, motor fuel tax, motor vehicle rental tax, etc. The Code of Virginia specifies the allocation and use of SEF. Accordingly, SEF can only be used for non-revenue generating capital, maintenance, and safety related projects.

13. The maximum amount of SEF that an airport can receive in a fiscal year is $2,000,000. Recipients of SEF are required to submit a Commonwealth Airport Fund Entitlement Utilization Report (EUR) for approval by the DOAV each year.

14. PHF also received federal funds on an annual basis in amounts greater than $10,000, the largest source being through the federal Airport Improvement Program (AIP), which provided grants for the planning and development of public-use airports. AIP funds were generally restricted to use in capital improvement projects and other improvements related to

enhancing airport safety, capacity, security, and environmental concerns. As a condition of accepting AIP funds, PHF accepted certain conditions and obligations associated with the grant assurances, including restrictions on the use of airport revenue.

15. Another source of funds that PHF accessed were Passenger Facilities Charges (PFC), which are governed by federal law and regulated by the Federal Aviation Administration (FAA). PFC are a local, per ticketed passenger fee charged by airports, and collected and remitted by airlines. Eligible airports apply to the FAA for the authority to collect PFC and the funds must be used for FAA-approved projects, which typically involve capital improvement projects. PFC specifically cannot be used by the airport for air service development or to subsidize an airline in any way.

16. In the wake of AirTran's departure and in order to assist with securing new air service, SPIRITO and/or others acting at his direction, also applied for and received a grant from the United States Department of Transportation (USDOT) through the Small Community Air Service Development (SCASD) grant program. The rules governing the SCASD grant also required a matching contribution from local sources as well as detail regarding any in-kind contributions being offered by the airport. The SCASD grant was a "reimbursable" grant, meaning that PHF would need to use its own funds to make the initial payments for expenses covered by the grant and then submit those expenses to the USDOT for reimbursement.

17. Thus, in addition to the SCASD grant funds, PHF also received a commitment from a local entity called the Regional Airport Service Enhancement Committee (RAISE) to provide $700,650 in matching funds for any funds reimbursed through the SCASD grant. The RAISE funds consisted of contributions made by seven localities surrounding PHF that benefited

5

from having air service available to their communities.

D. <u>The Loan Guarantee</u>

18. In 2014, after efforts to either obtain FAA certification or acquire an airline with its own license failed, PEX entered into an agreement with Vision Airways (Vision), to lease planes and crew for use under the PEX name. Despite this new agreement with Vision, PEX still lacked the funding needed to start operations and had various past due debts, including past rent due to PHF, a tax lien filed by the Internal Revenue Service, and lawsuits and/or judgments obtained by a number of other creditors. PEX was unable to raise funds from private investors to begin operations with Vision.

19. At some point in early-mid 2014, SPIRITO approached PEX and others and offered to assist PEX with procuring a $5 million loan by providing a loan guarantee to capitalize the company and begin operations in a partnership with Vision. The PEX board voted to accept and engage in such a loan using a guaranty provided by the PAC on or about May 15, 2014, prior to this subject being presented to the PAC for consideration.

20. Throughout the end of May 2014, SPIRITO outlined a number of deposit schedules to a number of individuals that would result in funds being available as collateral in order to guarantee the loan. SPIRITO sent emails regarding the uses of SEF, RAISE and SCASD grant funds. SPIRITO did not make inquiry of the DOAV as to whether SEF funds could be used to guarantee and collateralize a loan.

21. On or about May 28, 2014, a meeting to discuss the loan was held at TowneBank that included SPIRITO, a PAC member and other personnel form the bank. On May 29, 2014,

6

SPIRITO caused an email to be sent to the PAC members inquiring as to whether the PAC would be available for a Special Commission Meeting to take place on June 9, 2014 "to discuss an air service development opportunity."

22. On or about June 5, 2014, SPIRITO and others met with the RAISE committee to provide a presentation prior to the authorization of the use of RAISE funds for PEX. SPIRITO did not inform the committee members that any of the RAISE funds would be used for the purposes of a loan guarantee.

23. On or about June 5, 2014, SPIRITO sent an email to TowneBank confirming the creation of three collateral accounts and provided the titles of the accounts and the total funds to be held by each account as follows, "Peninsula Airport Commission State Entitlement Funds - $2,000,000 (Initial State Entitlement Funds) + ($608,333.33 Every September, December, March)...U.S. DOT Small Community Air Service Grant - $950,000...RAISE Matching Contribution to U.S. DOT Grant - $700,650 . . ."

24. Following a PAC Special Meeting that took place on June 9, 2014, the PAC agreed to grant its chairperson authority that would be used to co-sign a $5 million loan through TowneBank. At this time, PEX still had numerous outstanding liabilities including federal tax liens for unpaid employment taxes, unpaid credit card bills, unpaid legal bills, unpaid utility bills at PHF, and a $1 million loan from a local businessman. Some of the PAC members did not fully understand the implications of the loan guarantee and/or that airport funds would be used to fund collateral accounts for the loan to PEX.

25. The meeting was conducted largely in closed session and there was no mention of PEX or any loan guarantee during open session. The only actions taken during open session were

a motion to approve an air service agreement with Vision in support of the SCASD grant, and a motion to authorize the PAC Chairperson to *"...do and commit any act in furtherance of the policy of the Commonwealth of Virginia...which the Chair deems necessary to provide for the adequate, economical, and efficient provisions of air service and general business at the Newport News Williamsburg International Airport..."* This was the authorizing resolution that SPIRITO and the PAC's counsel presented and further represented would permit the PAC's chairperson to enter into the loan guarantee. There was no specific reference to PEX, the loan guarantee or airport related funds being used in any manner in this resolution.

26. Beyond the guarantee, the PAC was required to fully collateralize the loan in certain restricted accounts for which SPIRITO directed the funding. Various members of the PAC were unaware of these contributions or their sources. These collateral accounts were assigned the following titles and account numbers by TowneBank in response to SPIRITO's direction: <u>Peninsula Airport Commission U.S. DOT Small Community Air Serv Grant</u> (account number ending 6597) (also referred to hereinafter as "SCASD collateral account"); <u>Peninsula Airport Commission Raise Matching Contribution to US DOT Grant</u> (account number ending 6619) (also referred to hereinafter as "RAISE collateral account"); and <u>Peninsula Airport Commission State Entitlement Restricted Funds</u> (account number ending 6589) (also referred to hereinafter as "SEF collateral account").

27. On or about June 10, 2014, a representative for TowneBank sent SPIRITO an email reminding him that the approval of the loan was contingent on having $2 million in the <u>Peninsula Airport Commission State Entitlement Restricted Funds</u> account (SEF collateral account).

8

28. At some point around the time in June 2014 when SPIRITO was communicating with the bank and others about the funding for the collateral accounts for the loan, SPIRITO met with the airport's director of finance and instructed her about where the funds were going to come from to actually fund the accounts. SPIRITO directed that these collateral accounts be funded with sources of funds that included airport revenue and PFC.

29. With regard to the Peninsula Airport Commission State Entitlement Restricted Funds account (SEF collateral account), the airport was required to have at least $2 million in the account at the time of the loan closing and then additional transfers were to be made to the account as the airport received its SEF allotments from the DOAV. However, the airport only had approximately $720,000 in SEF available to transfer to the account at the time of closing. Accordingly, SPIRITO directed the transfer of $1,280,000 from the airport's unrestricted money market account that primarily consisted of airport revenues. Both transfers were made on June 11, 2014.

30. Additional transfers totaling approximately $1,465,979 were made to the Peninsula Airport Commission State Entitlement Restricted Funds account (SEF collateral account) from the airport's capital account which consisted of SEF received by the airport. No disclosure of the use of this allotment of SEF was provided in the EUR for the fiscal year of 2014, which ended on June 30, 2014. SPIRITO did not inquire from the DOAV or any other governing entity whether SEF could be used for this loan guarantee.

31. With regard to the: Peninsula Airport Commission U.S. DOT Small Community Air Serv Grant account, (SCASD collateral account) which was to contain SCASD grant funds, the airport did not have any funds from the grant to deposit into the account in June 2014, because

9

the grant was a reimbursable grant and no reimbursements had been made to PHF. Instead, as part of the TowneBank loan agreement, PEX was required to use $565,000 from the loan proceeds to repay the PAC the funds that it had received during a separate failed bid to purchase a different airline (Xtra Airlines) in June 2013. Since the original source of the $565,000 had been the operating account of the airport, consisting of airport revenues, the returned funds should have been deposited back into the operating account. However, SPIRITO instructed that those funds be deposited into the SCASD collateral account, which was done on June 18, 2014. Those funds, along with interest deposits into the account were used to make a $265,676.16 transfer to the RAISE collateral account on July 31, 2014.

32. Finally, the Peninsula Airport Commission Raise Matching Contribution to US DOT Grant account (RAISE collateral account), was supposed to receive and hold funds from RAISE, which it initially did. A transfer of $700,650 was provided to the airport on June 12, 2014, from the City of Newport News. However, approximately two weeks after these funds were deposited into the aforementioned collateral account, $650,650 was wired to Vision as part of the initial incentives that PHF promised to Vision, which resulted in only $50,000 remaining in the account. A transfer of $265,676.16 was made from the SCASD collateral account to the RAISE collateral account on July 31, 2014, and an additional transfer of $385,000 was made to the RAISE collateral account from the airport's capital account, which transfer consisted of restricted PFC funds.

33. The loan closing took place on or about June 18, 2014. The initial payment of $650,650 was wired to Vision on June 27, 2014, and the launch of service took place as planned on June 30, 2014. By July 17, 2014, less than one month after the loan was executed, PEX had

10

drawn down the entire loan with the exception of approximately $252,000 that had been put on hold until PEX could demonstrate that all back taxes due to the IRS had been paid. PEX requested a release of the final $252,000 on August 28, 2014, after furnishing proof that the overdue taxes had been paid.

34. The EUR submitted to the DOA for the fiscal year ended June 30, 2014 did not include the loan guarantee anywhere in either of the sections for "Entitlement Expenditures for Projects Completed in FY2014" or "Commitments for Ongoing and/or Future Projects," despite the transfer of $720,000 in SEF's into a collateral account on June 11, 2014. Furthermore, the DOAV raised concerns about several of the future projects that were listed on the form and during discussions about those projects, the loan guarantee was never mentioned or vetted through the DOAV.

E.  The Loan Default

35. Shortly after the receipt of the loan from TowneBank, PEX began flight operations out of PHF. PEX operated for approximately three months before the two planes that it was leasing from Vision were taken out of service because of maintenance issues and an accident with a truck on the tarmac of PHF.

36. On or about September 26, 2014, PEX officially suspended service and announced that flight operations would resume on or about October 16, 2014 with a new service carrier. However, PEX never resumed flight operations and eventually defaulted on numerous liabilities, including the TowneBank loan.

37. In the fall of 2014, SPIRITO instructed airport staff to delay submitting audited financial statements to the City of Newport News due to the concern of the loan guarantee being

reflected as a potential liability on the airport's financial statements. SPIRITO further instructed airport personnel to remove a reference to interest payments made to TowneBank in a summary provided with the December 2014 financial reports for the airport.

38. Through numerous emails between PEX and PHF officials, PEX maintained that they did not have any available funds and therefore could not make payments on any outstanding liabilities such as PFC's and the TowneBank loan. Consequently, PEX missed the interest payment on the loan that was due November 15, 2014. The airport, at SPIRITO's direction, made this monthly payment of $13,993.06 on December 8, 2014. Two more monthly interest payments were made by the airport on December 17, 2014 and January 20, 2015 for $11,918.71 and $12,971.73, respectively. All three payments were made from the <u>Peninsula Airport Commission State Entitlement Restricted Funds</u> account (SEF collateral account), but the funds used to make the payments originated from the airport's account that held collected PFC.

39. TowneBank eventually found PEX to be formally in default of the loan agreement. As PEX claimed to have no money to make any payments towards the loan, the airport was required to satisfy the loan with the proceeds of the three collateral accounts. On February 18, 2015, SPIRITO authorized funds in the amount of $4,222,246.82 to be withdrawn from the established collateral accounts. A final loan payment was made on April 6, 2015 in the amount of $250,022.84. The line of credit note for the loan to PEX was officially stamped "PAID IN FULL" on April 7, 2015.

40. Even after the loan was paid, SPIRITO caused the delay in reporting the use of any SEF for the loan repayment by not submitting an EUR for fiscal year 2015 until 2016, when the EUR for 2015 was due by July 31, 2015. When the EUR for both 2015 and 2016 was submitted

on or about October 13, 2016, following numerous inquiries/requests by the DOAV, the expenditure of SEF was characterized in the nature of air service development as a completed project in 2015 with an expenditure of $3,552,431, rather than as a loan guarantee.

41. On or about January 31, 2017, the FAA sent an e-mail inquiry to SPIRITO to determine if any FAA violations had occurred during the loan guarantee process, specifically airport revenue diversion. In the email, the FAA representative asked for some additional information related to the loan guarantee and payment including: if the airport had made the guarantee, when the guarantee was provided, how much the guarantee had been for, had the airport been required to pay on the loan, when any such payment was made, how much was paid by the airport, and specifically what type of funds were used to make the payment?

42. The next day, February 1, 2017, SPIRITO replied with answers to all of the FAA questions. In his reply, SPIRITO stated that $4,511,153 had been paid by the airport and falsely claimed that source of funds was "$3,510,642.00 VA State Entitlements allowable under section 3.1.1.3.2 of the DOAV Airport Program Manual...299,513.00 U.S. DoT Small Community Air Service Grant...700,998.00 RAISE Contribution..." Based on SPIRITO's response, it appeared to the FAA that the airport had not used any airport revenue or PFC as part of the loan guarantee and therefore further inquiry was not needed.

## COUNTS ONE THROUGH ELEVEN

THE GRAND JURY CHARGES THAT:

1. The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2. On or about the dates and in the manner set forth herein, in the Eastern District of Virginia, KENNETH R. SPIRITO, the defendant herein, being an agent of an organization and of a State or local government and an agency thereof, to wit: The Peninsula Airport Commission in Newport News, Virginia, said organization, government or agency receiving in the calendar years of 2014 and 2015 federal assistance in excess of $10,000 per year, did embezzle, steal, obtain by fraud and otherwise without authority knowingly convert to the use of a person other than the rightful owner and intentionally misapply property worth at least $5,000 and owned by and under the care, custody and control of The Penninsula Airport Commission, as follows:

| Count | Date (on or about) | Amount | Description of Transaction | Actual Source of Funds |
|---|---|---|---|---|
| 1 | 6/11/14 | $720,000.00 | Transfer to SEF collateral account (account number ending 6589) | State Entitlement Funds |
| 2 | 6/11/14 | $1,280,000.00 | Transfer to SEF collateral account (account number ending 6589) | Airport Revenue |
| 3 | 6/12/14 | $700,650.00 | Transfer to RAISE collateral account (account number ending 6619) | RAISE Funds |
| 4 | 6/18/14 | $565,000.00 | Transfer to SCASD collateral account (account number ending 6597) | Airport Revenue |
| 5 | 7/31/14 | $385,000.00 | Transfer to RAISE collateral account (account number ending 6619) | Passenger Facility Charges |
| 6 | 9/30/14 | $460,119.37 | Transfer to SEF collateral account (account number ending 6589) | State Entitlement Funds |
| 7 | 10/08/14 | $148,213.96 | Transfer to SEF collateral account (account number ending 6589) | State Entitlement Funds |
| 8 | 12/08/14 | $26,000.00 | Transfer to SEF collateral account (account number ending 6589) | Passenger Facility Charges |

| | | | | |
|---|---|---|---|---|
| 9 | 12/29/14 | $666,666.66 | Transfer to SEF collateral account (account number ending 6589) | State Entitlement Funds |
| 10 | 1/20/15 | $13,000.00 | Transfer to SEF collateral account (account number ending 6589) | Passenger Facility Charges |
| 11 | 4/06/15 | $249,312.79 | Transfer to SEF collateral account t(account number ending 6589) | State Entitlement Funds |

(In violation of Title 18, United States Code, Section 666(a)(1)(A).)

## COUNTS TWELVE THROUGH SEVENTEEN

THE GRAND JURY FURTHER CHARGES THAT:

1. The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2. On or about the following dates and in the manner described below, in the Eastern District of Virginia and elsewhere, KENNETH R. SPIRITO, the defendant herein, did knowingly engage and attempt to engage in the following monetary transactions by, through and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, money deposits which represented fraudulently obtained funds from investors, such property having been derived from a specified unlawful activity, that is Conversion and Misapplication of Property from an Organization Receiving Federal Funds, in violation of United States Code, Section 666(a)(1)(A):

| Count | Date (on or about) | Financial Transaction |
|---|---|---|
| 12 | 12/8/2014 | SPIRITO made or caused to be made a $13,993.06 monthly interest payment on the PEX loan from the SEF collateral account (account number ending 6589) at TowneBank. |
| 13 | 12/17/2014 | SPIRITO made or caused to be made a $11,918.71 monthly interest payment on the PEX loan from the SEF collateral account (account ending 6589) at TowneBank. |
| 14 | 1/20/2015 | SPIRITO made or caused to be made a $12,971.73 monthly interest payment on the PEX loan from the SEF collateral account (account ending 6589) at TowneBank. |
| 15 | 2/18/2015 | SPIRITO authorized or caused to be authorized a $3,229,512.39 principal payment on the PEX loan from the SEF collateral account (account ending 6589) at TowneBank. |
| 16 | 2/18/2015 | SPIRITO authorized or caused to be authorized a $299,512.56 principal payment on the PEX loan from the SCASD collateral account (account ending 6597) at TowneBank. |

| 17 | 4/6/2015 | SPIRITO authorized or caused to be authorized a $250,022.84 principal payment on the PEX loan from the SEF collateral account (account ending 6589) at TowneBank. |

(In violation of Title 18, United States Code, Section 1957.)

## COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES THAT:

1. The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2. On or about February 1, 2017, in the Eastern District of Virginia, KENNETH R. SPIRITO the defendant herein, with the intent to impede, obstruct, and influence the proper administration of, or in relation to, a matter that the defendant knew or contemplated was within the jurisdiction of the Federal Aviation Administration (FAA), a department and agency of the United States, did knowingly and fraudulently conceal, cover up, falsify and make a false entry in a document, to wit: an electronic response to an FAA inquiry concerning the type and amount of funds used to make the payment on a loan guarantee in association with People Express, to which the defendant knowingly and fraudulently stated that part of the $4,511,153 loan payment was made through "VA State Entitlements" ($3,510.642), "U.S. DoT Small Community Air Service Grant" ($299,513) and "RAISE Contribution" ($700,998) when, in truth and fact, as the defendant knew, other sources of funds were used to make the loan payment and the amount of payment attributed to "VA State Entitlements" was not accurate.

(In violation of Title 18, United States Code, Section 1519.)

## FORFEITURE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1. The defendant, if convicted of any of the violations alleged in Counts 1-11 of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to any of the violations.

2. The defendant, if convicted of any of the violations alleged in Counts 12-17 of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in any of the violations, or any property traceable to that property.

3. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4. The property subject to forfeiture includes, but is not limited to, the following property:

    a. A monetary judgment in the amount of not less than $4,563,312.78, representing the proceeds of the scheme alleged in Counts 1-11.

(In accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); Title 28, United States Code, Section 2461.

United States v. Kenneth R. Spirito, 4:19cr 43

A TRUE BILL:

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

_____
FOREPERSON

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By: _____
Brian J. Samuels
Assistant United States Attorney
Virginia State Bar No. 65898
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866

By: _____
Lisa R. McKeel
Assistant United States Attorney
Virginia State Bar No. 28652
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866