**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

UNITED STATES OF AMERICA

v.                                                    Criminal No.: 4:19cr43

KENNETH R. SPIRITO,

                         Defendant.

<u>DEFENSE MOTION TO DISMISS COUNTS 1-17</u>

Kenneth Spirito, by counsel, moves to dismiss counts 1-17 for the reasons that follow.

**INTRODUCTION**

The government alleges that Mr. Spirito committed the crime of mismanaging public funds as a civil servant. He is not alleged to have acted for personal gain or to give improper favor to a benefactor inside or outside of government. He is not alleged to have intentionally deceived anyone. Instead, the indictment conflates the actions of Mr. Spirito with those of his employer, his subordinates, and his employer's legal counsel to blame Mr. Spirito for an unpopular business decision for which he is not legally responsible (were it even a crime).

First, he is charged under a statute, 18 U.S.C. § 666, that does not apply to his situation – a civil servant who at worst made a mistake in implementing state and federal programs for no personal gain. Second, even if § 666 could apply, neither he nor his employer violated any laws that could form the basis for "misapply]ing" funds under § 666. Third, even if § 666 could apply in this case, Mr. Spirito simply is not the person or entity that "caused" the events that the government seeks to criminalize. Fourth, even if he or his employer violated any laws or funding regulations in the course of their public service, there is not a scintilla of evidence that Mr. Spirito acted corruptly in a "knowing" or "intentional" manner. To the contrary, it is uncontested that his employer's legal

1

counsel repeatedly (and correctly) advised Mr. Spirito's employer that his actions complied with the law. The government's effort to include misleading hints that Mr. Spirito or others sought to hide the loan guaranty does not rise to the level of corrupt intent or motive.

In short, the indictment fails to allege an actual crime by Mr. Spirito. Instead, it makes him the fall guy, chosen alone from half a dozen participants, to bear the public shaming the local federal prosecutors have decided is needed for a scandal sensationalized in the local media.

## BACKGROUND

In June 2014, the Peninsula Airport Commission ("the PAC") guaranteed a $5 million loan from TowneBank to People Express Airlines ("PEX") to help PEX launch commercial air service at the Newport News / Williamsburg International Airport ("Airport").  The PAC is a six-member commission established by Virginia statute to exercise the powers necessary to establish and operate the Airport.  1946 Acts of Assembly, c. 22, § 1.  **Exhibit R**. The PAC is *not* an advisory commission, contrary to the misstatement of law in the Indictment (¶ 3). Only the PAC, as an "independent body corporate" is "invested with the rights, powers and authority and charged with the duties set forth in" its enabling legislation to "establish and operate" the Airport. Id., § 8. No one else, certainly not its subordinate executive director, holds independent power to establish and operate the Airport.[1] The PAC can exercise its powers with a quorum of three commissioners.  See PAC By Laws, at page 8.[2]

---

[1] "The Commissioners may appoint an executive director, who shall not be a commissioner, who shall exercise such powers and duties as may be delegated to him by the Commissioner, including powers and duties involving the exercise of discretion." Id. at § 2.
[2] https://flyphf.com/wp-content/uploads/2018/06/PAC-BYLAWS.pdf.

2

The PAC's decision to guarantee PEX's loan was the result of a group effort by certain commissioners, its legal counsel, prominent members of the business community, and the PAC's executive director, Mr. Spirito, to bring badly needed low cost commercial air service back to the Airport after its pervious low cost carrier, AirTran, had left in 2012. The indictment mischaracterizes Mr. Spirito's role in the process, but for purposes of this motion to dismiss those allegations are not disputed. Even as alleged, the facts do not support a conviction under 18 U.S.C. § 666(a)(1)(A) (Counts 1-11), and by extension, 18 U.S.C. 1957 (Counts 12-17), which depends on § 666 as its underlying offense.

Factually, it is enough to acknowledge that Mr. Spirito advised the PAC about how to structure and fund the loan guaranty, including the ultimate mix of funding sources used to collateralize the loan. With this information, the PAC, by resolution on June 9, 2014, authorized its chairperson to enter into the loan guaranty. Indict. ¶24-25. The PAC acted with a quorum of four, with one of the four abstaining. **Exhibit A**. Thus, by law, the PAC was authorized to act by a majority of the remaining three.

Those three included its chairperson and its secretary, both of whom played knowing, active roles in executing the loan guaranty.[3] The chairperson, Ladonna Finch, knowingly executed the documents that unambiguously stated that the PAC was guaranteeing a $5 million loan; that by the very nature of a "guaranty" the PAC was liable for the balance if PEX defaulted; and that the PAC was providing collateral funds in three bank accounts to meet those potential liabilities. **Exhibits K1– K5**. Another PAC commissioner, James Bourey, as Secretary, signed the deposit account cards with TowneBank on the day the PAC passed the resolution (June 9, 2014), **Exhibits J1-J2**, after he

---

[3] The third commissioner, who also voted in favor of the resolution, was Aubrey Fitzgerald, who is deceased.

had played an instrumental role in devising the loan guaranty to help PEX. Another PAC Commissioner, Bert Bateman, worked for TowneBank and helped set up the PAC's collateral accounts. The PAC's lawyer, Bert Kelly, drafted the loan documents and opined that the loan guaranty and the use of Virginia state entitlement funds (SEF) to collateralize the loan were legal. **Exhibits Q**. Mr. Kelly also sat on the TowneBank board.

Unfortunately, PEX defaulted on the loan and the PAC was legally obligated under the terms of its executed loan documents to cover the loan. At first, Mr. Spirito tried to claw funds back from PEX, as voluminous discovery documents establish, but there came a point when the PAC chairman (Mr. Bourey, by this time) and PAC counsel, Mr. Kelly, directed Mr. Spirito, with full knowledge of the PAC commissioners, that the Airport had to meet its legal obligations and pay the interest and principle on the loan. As a result, Mr. Spirito informed the Airport's finance director (an employee of the PAC subordinate to Mr. Spirito), who then took the steps necessary to make the payments.

## ARGUMENT

Counts 1-17 fail to allege facts that constitute a crime. First, the conduct alleged in the indictment falls outside the scope of 18 U.S.C. § 666, as held by two circuit courts of appeal and probably by the Supreme Court within the year. Second, even if within the scope of § 666, Mr. Spirito's actions did not violate any law or regulation because the use of SEF was perfectly legal under state law, whether popular or not. Third, Mr. Spirito did not "cause" the PAC or its subordinate employees to act; the PAC was the causal agent of its own actions and those of its employees, both pursuant to its statutory powers and its contractual obligations. Fourth, Mr. Spirito did not have a culpable *mens rea*. In that regard, the government tries to bolster its legally deficient case by stringing together a disjointed list of events and circumstances in the indictment meant to

suggest a guilty state of mind. However, this innuendo is an insufficient substitute for actual evidence of corrupt intent.

I.     **18 U.S.C. § 666 DOES NOT REACH MR. SPIRITO'S ALLEGED CONDUCT BECAUSE MR. SPIRTO ACTED AT THE DIRECTION OF HIS EMPLOYING PUBLIC ORGANIZATION AND BECAUSE IT IS UNCONTESTED THAT AS A PUBLIC SERVANT MR. SPIRITO DID NOT ACT FOR PERSONAL GAIN OR CORRUPT MOTIVE.**

18 U.S.C. § 666(a)(1)(A) applies to entities that receive more than $10,000 annually from the federal government. That the Airport receives such funds is not in dispute for this motion.  Under this statute,

> "(a) whoever, . . .
>
> (1) being an agent of an organization, or of a state [or] local government, or any agency thereof,
>
> (A) embezzles, steals, obtains by fraud, or otherwise without authority, knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that
>
> (i)      is valued at $5,000 or more, and
>
> (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency"

commits a felony. The government's theory is that Mr. Spirito "intentionally misapplie[d]" or "knowingly convert[ed]" funds in the control of his employer, the PAC, when that employer knowingly obligated funds under its control, in excess of $5,000, to guaranty the loan between TowneBank and PEX.

§ 666 is captioned "Theft and bribery concerning programs receiving Federal funds," and the Supreme Court refers to it as an anti-bribery rule. *United States v. Thompson*, 484 F.3d 877, 881 (7th Cir.2007), citing *Sabri v. United States*, 541 U.S. 600 (2004), *Fischer v. United States*, 529 U.S. 667

5

(2000), and *Salinas v. United States*, 522 U.S. 52 (1997). It has never been held to apply to a civil servant who simply did his job but, at worst, made a mistake that violated a law or regulation in a manner that did not benefit himself. To the contrary, it has been held **not** to apply to such a situation by the Seventh Circuit: see *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007)(§666 conviction reversed where state employee violated regulations by awarding travel procurement contract based in part on political reasons but in the absence of personal gain or motive); and the Eleventh Circuit: see *United States v. Jimenez*, 705 F.3d 1305 (11th Cir. 2013)(in reversing a §666 conviction, finding *Thompson* "helpful" in deciding what the statutory phrase "intentionally misapplies" "*does not* mean:" namely that it did not apply to Thompson who "received neither a bribe nor a kickback, and at worst … had made a 'deviation from state procurement rules.'")(emphasis in original).

All other reported cases applying § 666(a)(1)(A) appear to involve obvious actual theft or kickback schemes that convey a benefit to the defendant – all except *United States v. Baroni*, 909 F.3d 550 (3rd Cir. 2018), i.e., the Bridgegate case. See e.g., *United States v. Baldridge*, 559 F.3d 1126 (10th Cir. 2009)(County funds used for work on private home disguised by false billings); *United States v. De La Cruz*, 469 F.3d 1064 (7th Cir. 2006)(use of stolen government concrete on private residences and property); *United States v. Delano*, 55 F.3d 720 (2nd Cir. 1995)(supervisor's use of public employees for private projects from which he benefitted); *United States v. Genova*, 333 F.3d 750 (7th Cir. 2003)(use of city funds to pay for political work with kickbacks); *United States v. Frazier*, 53 F.3d 1105 (10th Cir. 1995)(non-profit's use of grant funds for improper purposes under applicable regulation, where defendant created fake invoices to mask true use); *United States v. Urlacher*, 979 F.2d 935 (2nd Cir. 1992)(disappearance of over $300,000 in police department funds with only $10,000 shown to be used for legitimate purposes).

In the one exception, *Baroni*, 909 F.3d 550 (3ʳᵈ Cir. 2018), the defendants were convicted under § 666(a)(1)(A) for needlessly tying up traffic on the George Washington Bridge for political reasons. In upholding the conviction, the Third Circuit distinguished the Seventh Circuit's holding in *Thompson*, 484 F.3d 877, by viewing an improper political motive as a proxy for personal gain to find corrupt intent. Even with that circumstance, which is absent in Mr. Spirito's case, the Supreme Court accepted certiorari in the case on June 29, 2019.

In sum, the case law makes this prosecution remarkable enough in its absence of supporting precedent. Even more so, the statute has certainly never been held to apply in a situation like Mr. Spirito's where the defendant acted consistent with, and in accordance with, the express dictates and control of his employer – the very "organization, or . . . state [or] local government, or . . . agency thereof" that is the meant to be protected by this very statute.[4] In essence, Mr. Spirito is alleged to have helped his employer misapply its own funds. The implications for civil servants are extraordinary and unprecedented. If this goes unchecked, all public employees should worry about finding themselves twisting in the wind when the local prosecutor decides to make a political point and the savvier community leaders who serve on public boards and commissions get a free pass.

## II.     MR. SPIRITO DID NOT "MISAPPLY" FUNDS UNDER 18 U.S.C. § 666(a)(1)(A) BECAUSE THE USE OF STATE ENTITLEMENT FUNDS (SEF) TO GUARANTY THE LOAN WAS LEGAL UNDER STATE LAW

The indictment alleges that the use of state entitlement funds (SEF) to collateralize the loan was illegal under state law, making its use "unauthorized" or a "misapplication" under 18 U.S.C. §

---

[4] To the extent the government's theory is that the State is the victim, not the PAC, that theory requires a finding that the use of state funds was contrary to the law, which it was not. *See* Sec. II, *infra*.

666. In fact, neither the Code of Virginia nor state agency policy and practice prohibited such use in 2014.

To the contrary, the Virginia Department of Aviation ("DOAV"), in its Manual (in § 3.1.1.3.2), its written policy rulings, and in correspondence *in this very case*, made it clear that an airport's use of funds in a manner that DOAV considered "outside of normal expenditures" simply meant that it would lead to the airport's ineligibility for future discretionary funds from the agency, not that such use was illegal. PAC's legal counsel relied on § 3.1.1.3.2 to opine that the loan guaranty was legal. Even more importantly, the General Assembly had the same understanding when it enacted legislation in 2017, in direct response to the PAC's loan guaranty, to make the use of SEF in this manner illegal. In sum, the loan guaranty was legal under State law before the General Assembly acted.

A. **Airport Funding from the State Is Comprised of Annual State Entitlement Funds (SEF) Given to Each Airport and Possible Discretionary Funds for Which Airports Must Apply**

In the relevant time period, the Airport received $2,000,000 each year in SEF based on a statewide funding formula. Upon receipt, the Airport legally could use the funds as it saw best to foster its aviation needs as long as it was consistent with the DOAV Manual. In this regard, the Manual divided the use of SEF into two categories: (1) uses that were delineated as "normal expenditures" and (2) uses that were not, and thus were delineated as "outside of normal expenditures." The use of SEF for the loan guaranty fell into this second category.

DOAV policy also permits airports to apply for and receive "discretionary funds" from the agency for certain eligible projects. Eligibility depends in part on how an airport has used its SEF each year, so DOAV requires an airport to submit an annual report of how it has used its SEF if the

8

airport intends to apply for discretionary funds. The report is referred to as an Entitlement Utilization Report ("EUR").

**B. DOAV Uses Entitlement Utilization Reports (EUR) to Determine Whether an Airport is Eligible for Discretionary Funds; Absent a Request for Discretionary Funds, An Airport Is Not Required to Submit an EUR.**

Airports are not required to submit EUR to DOAV; they are only a tool used by DOAV to monitor the use of SEF by an airport if it subsequently requests discretionary funds. *See* Virginia Office of the State Inspector General (OSIG) *Audit of the Virginia Department of Aviation*, May 22, 2017, at Page 11. Document No. 2017-PR-011-DOAV ("The only oversight DOAV currently has for state entitlement funds are the annual Entitlement Utilization Reports, which airport sponsors are not required to submit.").

Absent an airport request for discretionary funding, DOAV in practice does not expect to receive an annual EUR. This widely known policy was expressly stated by DOAV personnel as far back as 2006 in an internal email related to correspondence with the PAC's lawyer.[5]

This agency practice was reiterated in an email to the Airport in May 2012. **Exhibit L.** DOAV asked the Airport to address several issues raised in prior year EUR. The Airport's assistant director expressed her "frustration with this process." She noted that "DOAV has had our FY11 EUR for many months and the other EURs for years. The fact we [are] just now dealing with these

---

[5] On October 2, 2006 DOAV employees discussed the fact that the PAC's lawyer "called to inquire as to DOAV's 'right' to require explanations of state entitlement funded projects." The employee noted that "[w]e discussed the fact that the [agency] requires entitlement utilization reports (EUR) of commercial service airports on the pretense that those airports may someday request state discretionary funds." **Exhibit B.**

last-minute major EUR changes is practically impossible to keep up with." The DOAV employee

responded:

> You are correct in that I was remiss in not verifying that the FY2010 and FY2011 EUR's were completed properly and taken before the VAB prior to now. **Part of that decision was a lack of urgency on my part as [the Airport] had no plans to ask [for] state discretionary funds during FY2011 and FY2012**. (Emphasis added).

Thus, absent a request for discretionary funds, DOAV has no use for EUR. However, if discretionary

spending is requested, DOAV looks to Manual § 3.1.1.3.2 to determine eligibility.

**C. Pursuant to DOAV Manual § 3.1.1.3.2, the Use of SEF for a Loan Guaranty or Any Other Project "Outside of Normal Expenditures" Was Legal in 2014; But the Consequence Was that the Airport Became Ineligible for Discretionary Funding.**

The interplay of SEF and discretionary funding is articulated in Manual § 3.1.1.3.2, the

DOAV policy followed by the PAC in its use of SEF to collateralize the loan guaranty. § 3.1.1.3.2

states:

> *3.1.1.3.2 Projects Outside of Normal Expenditures.* Certain projects not listed or generally described in this manual have been determined to be outside of normal project expenditures. **If the** sponsor of an air carrier **airport uses state entitlement funds for such a project, the state's share of the project cost will be counted against new requests for state discretionary funding. DOAV will maintain an accounting of project activity outside of normal project expenditures. When a sponsor for an air carrier airport requests state discretionary spending, the balance in the accounting will be deducted from the state's share of the requested project**. Projects will be retained in the accounting until they are deducted from a state discretionary project request or they have been on record **for six fiscal years**, at which time the projects will be removed from the accounting. (Emphasis added).

§ 3.1.1.3.2 unambiguously states that the use of SEF for projects not listed in the Manual "will be

counted against new requests for state discretionary funding." That is, the consequence for using

SEF for projects not "authorized" by the DOAV Manual is that it will lead to a corresponding offset

in discretionary funding, not that the project will be declared illegal. If that were the case, § 3.1.1.3.2 would be a highly curious statement of state law. It would in effect recognize that the illegal use of funds has as its only consequence an offset in discretionary funds within a structured state funding scheme.

**D.  Written Policy Rulings from DOAV, Including One Involving the Lynchburg Airport, Confirm That the Use of SEF for a Loan Guaranty or Any Other Project "Outside of Normal Expenditures" Was Legal in 2014.**

In accord with this commonsense reading of state law is DOAV's denial of the Lynchburg Regional Airport's request in 2013 to use SEF in an unauthorized manner "without the future loss of state discretionary funding." **Exhibit C**.

In April 2013, Lynchburg faced a short-term funding crisis and asked DOAV if it could use SEF "outside of normal expenditures" to fund air traffic tower operations without it leading to a loss of discretionary funds under § 3.1.1.3.2. DOAV did not respond by saying that such an "unauthorized" use was illegal, and that Lynchburg's executive director should get ready for prison if he used SEF to fund it. Instead, the VAB debated whether to grant a one-time waiver to permit such funding without a corresponding offset in discretionary funds for three years. As noted in the official meeting minutes, the State explained the intersection of "unauthorized" SEF use, discretionary fund offsets, and the use of EUR to foster this interplay of funding programs:

> DOAV explained that the three-year period begins at the end of the fiscal year in which [SEF] were spent on projects not matching program eligibility.  The total of such [SEF] spent by an airport and reported on the annual [EUR] are counted against any requests for state discretionary funds made by the airport for three years or until the amount is recovered, whichever happens first.

In the end, DOAV denied the waiver, explaining the pertinent policy thusly:

11

. . . the policy stated in section 3.1.1.3.2 of the Airport Program Manual regarding projects outside of normal expenditures.  Specifically, the use of [SEF] for projects other than those listed or generally described in the Manual, to include funding tower operations, will result in the state's share of the project cost being counted against any new requests for state discretionary funding by Lynchburg Regional Airport for a period of three fiscal years. The board unanimously approved the motion….

Thus, in circumstances legally indistinguishable from this case, DOAV did not seek to prohibit Lynchburg from using funds in a manner "outside normal expenditures," much less assert that such use violated the state law. It merely let Lynchburg know that under state law its use of SEF outside of normal expenditures would lead to funding offsets that it had to consider as it developed its own sense of priorities.

### E.  DOAV Policy in Relation to the Newport News / Williamsburg Airport Confirms That the Use of SEF for a Loan Guaranty or Any Other Project "Outside of Normal Expenditures" Was Legal in 2014.

DOAV  expressly applied this same principle to the Airport twice, including *to the Airport's loan guaranty* before politics came into play. First, in 2015, the Airport was planning to fund certain buildouts in its terminal building, including a new security checkpoint system. On December 17, 2015, DOAV emailed the Airport's assistant director to note that "information . . .  appears to indicate the proposed use of state funds . . . for 'ineligible' space." [Quotation in original].

**Exhibit M**. Under the circumstances, the DOAV employee noted:

I just want to remind you that if it is determined that [SEF] are/were used for ineligible projects, or portions of projects, then that amount will have to be charged against any state discretionary funding request during a period of six years[6] after the questionable funds are reported on an annual [EUR].

---

[6] The penalty period had been extended from three years to six years since the Lynchburg Airport waiver request.

The State employee knew that such use of SEF on "unauthorized" projects was not illegal and only would have consequences with regard to discretionary funding.

In accord with this, DOAV exchanged emails with Airport personnel in January 2017 about the Airport's use of SEF for the PEX  loan guaranty, which the Airport's FY2015 EUR labeled as an "Air Service Development" project. In a January 26, 2017 email, DOAV noted that the project was "not eligible" and that if it were to "remain on the [EUR] the staff will recommend . . .  that any requests for state discretionary funds prior to July 1, 2021 be reduced by $3,582,422.29" [the amount of SEF used for the loan guaranty]." **Exhibit N**. As with the Lynchburg Airport and with the Airport in 2015, DOAV did not demand the money back or assert that its use was illegal. It just applied State law and noted that an offset in discretionary funds would apply.


F.  **The General Assembly's Enactment of a Statute in 2017 Prohibiting Future Loan Guarantees Confirms that the State Recognized the PAC's Loan Guaranty to be Legal**

There was nothing illegal or improper about the PAC's use of SEF for the loan guaranty. This fact is confirmed by the General Assembly's passage of legislation, S 1417, to address this very issue and close a perceived loophole in the law.  **Exhibit P**. The bill was approved by the General Assembly and signed into law in March 2017 as a direct result of the loan guaranty. It enacted into statutory law, at Virginia Code Sec. 5.1-2.16, the proviso that SEF "shall not be used for … purposes related to supporting the operation of an airline, either directly or indirectly, through grants, credit enhancements, or other related means."  Any such project, by its very terms, would already have been deemed a "project outside normal expenditures" under § 3.1.1.3.2 of the DOAV Manual and thus "unauthorized," using the Manual's parlance. If such use were already illegal, the General Assembly would have had no need to enact S 1417.

Thus, no conduct related to the loan guaranty was illegal under state law such that it could fall within the ambit of 18 U.S.C. § 666(a)(1)(A) as a possible "unauthorized conversion" or "intentional misapplication."

### III.   MR. SPIRITO DID NOT "CAUSE" ANY OF THE COLLATERAL DEPOSITS (COUNTS 1-11) OR PAYMENTS ON THE LOAN (COUNTS 12-17); RATHER, THE PAC ACTED PURSUANT TO ITS STATUTORY POWERS AND CONTRACTUAL OBLIGATIONS.

Mr. Spirito was not the causal agent of the loan guaranty as a matter of law. To arrive at a contrary conclusion, the indictment misconstrues the legal context of Mr. Spirito's actions. First, it ignores that the PAC was the causal agent for its own actions, factually and legally. Second, it ignores that Mr. Spirito acted at the lawful direction of his employer – the PAC – and not the other way around. Third, it ignores that the PAC and its employees, including Mr. Spirito, acted pursuant to contractual obligations entered into knowingly by the PAC.

In short, the indictment misconstrues the legal relationship between the PAC, its employees, and its legal counsel, who did not report to Mr. Spirito as a subordinate employee.  In effect, the indictment imagines a flow chart in which all arrows point to Mr. Spirito in the middle, when in reality, and legally, both Mr. Spirito and legal counsel were answerable to the PAC, and only the PAC's subordinate employees reported to Mr. Spirito, while also being answerable to the PAC.

**A. As Legal Authority to Act Resided in the PAC, Not Mr. Spirito, the PAC Was the Causal Agent of its Own Actions and the Acts of its Employees**

The flaws in the government's legal theory are encapsulated in the indictment's misstatement of law in ¶3 that the PAC is, in essence, an advisory body.[7] To the contrary, pursuant to its enabling Act, only the PAC has authority to operate the Airport. 1946 Acts of Assembly, c. 22. **Exhibit R**. All power to act with regard to the operation of the Airport derives from the power granted to the PAC in its enabling statute. The PAC can delegate its power as it determines, including vesting duties and powers in its legal counsel and/or its executive director. But no act performed by its counsel, executive director , or any subordinate employee has a source of power and authority other than that which is delegated by the PAC. In contrast, advisory commissions, by their nature, provide advice to persons or entities who are not required to take the advice because they have a source of power to act that is in some manner independent of the advisory commission.

Put simply, Mr. Spirito did not have the authority to take PAC directives "under advisement." When the PAC spoke through its resolutions, chairman, contractual obligations, or any other lawful means, Mr. Spirito was legally obligated as the PAC's executive director to comply.

**B. Mr. Spirito Acted at the Lawful Direction of the PAC, Not the Other Way Around**

Mr. Spirito acted pursuant to the lawful directives of the PAC, and in some instances, PAC's legal counsel, not the other way around. As but one example, Count 12 alleges that on December 8, 2014, Mr. Spirito – not the PAC or its chairman or its lawyer, – criminally "caused" the payment of

---

7 "In the capacity of Executive Director, SPIRITO was essentially the chief executive officer of the airport. Although he reported to the PAC, these members largely served in an advisory capacity and took their direction from information that SPIRITO and his staff provided." Indict., ¶3.

interest on the loan by the PAC after PEX defaulted and TowneBank demanded payment.  But based

on emails in the possession of the government, it is undisputed that the PAC chairman and PAC's

counsel repeatedly instructed Mr. Spirito to make the payment; that all six PAC Commissioners

were aware that its chairman and counsel had authorized and instructed Mr. Spirito  to make the

payment; and that ultimately, the PAC's director of finance, not Mr. Spirito, made the payment after

Mr. Spirito passed along the instruction. **Exhibits D1 – D5**. [8]  That is, legally, Mr. Spirito's actions

with regard to the interest payment were of a kind no different than the finance director's – he and

she acted pursuant to obligations imposed on them by their employer.

---

[8] On November 25, 2014, TowneBank emailed Mr. Spirito to ask if the PAC had decided to pay the $13,993 of interest due in November, leading to subsequent emails:

BOUREY (PAC Chairman): Ken, we really need to pay this at this time.

SPIRITO: We will need board action to do this?

BOUREY: I would certainly like Bert [Kelly]'s opinion on this but I would not think so.

KELLY (PAC Counsel): … Ken has my approval to pay.

SPIRITO: I cannot feel comfortable paying the loan without a default being issued.

BOUREY: If they default then we get nothing. This was discussed at length.

SPIRITO: I know, but I was never given authority by the board to make P&I payments on the loan. I only have authority to make the collateral payments.

BOUREY: I thought that Bert [Kelly] had addressed this issue.

KELLY: [W]e need to do this. As Executive Director you have authority to pay our obligations. No approval by the Commission is necessary.

SPIRITO: Ok…. Can either of you notify the PAC and let them know what has been done?

KELLY [*To all six PAC Commissioners, copied to Bourey and Spirito*]: [The] interest payment due for November has not been paid and TowneBank has issued a request for payment by the Commission…. I have advised Ken to pay this.

FITZGERALD [*A PAC Commissioner, copied to all other commissioners*]: Thanks. We have no choice.

TOWNEBANK [Four days later]: Ken, are you going to make the interest payment today?

BOUREY [*To Spirito*]: I assume you are going to tell her yes.

SPIRITO [*To Bourey*]: Renee [Ford] our dir[ector of] finance is out today. The earliest will have to be Monday.

BOUREY [*To Spirito*]: Please let her know that.

FORD [*To TowneBank, on that Monday*]: I have made the transfer. You can take $13,993.06 out … for the November interest payment.

### C.  Mr. Spirito Acted Pursuant to the PAC's Contractual Obligations

Counts 1-11 allege violations of 18 U.S.C. § 666 for each transaction that moved funds into the bank accounts used by the PAC as collateral for the loan guaranty. Counts 12-17 allege violations of  18 U.S.C. § 1957 for each transaction that moved funds out of the bank accounts to pay the loan pursuant to the PAC's guaranty. Like the interest payment in Count 12, all such financial transactions were handled for the PAC in the first instance by its director of finance, not Mr. Spirito, but with his oversight and supervision in the normal chain of delegated powers from the PAC.  In none of these transactions did Mr. Spirito legally "cause" the deposit or payment anymore than did the director of finance.

All deposits and all payments were made pursuant to the contractual obligations of the PAC when it acted to guaranty the PEX loan. **Exhibits K1-K5**.  The loan documents, duly signed by the PAC chairperson on June 18, 2014, legally obligated the PAC to engage in each transaction listed in Counts 1-17. Those transactions would have occurred regardless of whether Mr. Spirito had been the executive director at the time or had left for a job elsewhere on June 19, 2014. The payments resulted from the PAC's volitional and knowing acts; not Mr. Spirito.


### IV.     MISLEADING SUGGESTIONS THAT MR. SPIRITO TRIED TO HIDE THE LOAN GUARANTY ARE INSUFFICIENT TO ESTABLISH A  CULPABLE *MENS REA* OR IMPROPER MOTIVE UNDER 18 U.S.C. § 666(a)(1)(A), AND, TO THE CONTRARY, MR.  SPIRITO  AND  THE  PAC  SUFFICIENTLY  DISCLOSED  THE  LOAN GUARANTY.

This case is indistinguishable from *Thompson*, in which the Seventh Circuit held that a lack of personal gain by a civil servant who simply makes a mistake or error in judgment in his job cannot be guilty of violating 18 U.S.C. § 666. And, as noted, the government's case against Mr. Spirito can rise no higher than the Bridgegate case, in which the Third Circuit distinguished those

defendants' acts from *Thompson* by substituting an improper political motive for the corrupt *mens rea* of personal gain, neither of which are present in this case.

Under the circumstances, the government substitutes misleading statements about Mr. Spirito's alleged effort to conceal the loan guaranty as a proxy for a corrupt *mens rea*, but the allegations legally fail to support a claim under 18 U.S.C. § 666. In any event, Mr. Spirito and the PAC disclosed the loan guaranty in public documents and directly to the media.

### A. Mr. Spirito Did Not Act to Hide or Unduly Delay Disclosure of the Loan Guaranty

The indictment alleges three ways in which Mr. Spirito acted to hide or delay disclosure of the loan guaranty:

**(1)** He failed to file annual EUR with DOAV after the loan guaranty in 2014 and then referred to the project obliquely as "air service development" in its EUR filed late in 2016 (¶ 30,34,40);

**(2)** He instructed Airport staff  "to delay submitting audited financial statements to the City of Newport News due to the concern of the loan guaranty being reflected as a potential liability on the airport's financial statements;" (¶ 37); and

**(3)** He instructed staff to "remove a reference to interest payments made to TowneBank in a summary provided with the December 2014 financial reports for the airport." (¶ 37).

For purposes of a motion to dismiss, all these "allegations" can be taken as true. However, they are legally material to the government's case only to the extent the government has not misconstrued or elided the relevant law or agency policy, which is not the case. Even then, these threadbare allegations legally cannot support a finding of culpable *mens rea*.

18

1. **Mr. Spirito and Airport Staff Followed Accepted DOAV Policy in Submitting its EUR**

The allegations involving EUR leave out the legal context of the DOAV policy, set forth above in Sec. IIB, that make it clear that a delay in submitting EUR carries no weight in assessing culpable intent since airports are not even required to submit EUR unless they are seeking discretionary funds – and it is undisputed that the Airport did not seek discretionary funds after the loan guarantee. Also, the government selectively omits the DOAV Manual statement that "air service development" projects on their face are "ineligible" for SEF use, such that the Airport's very use of the term "air service development" for the loan guaranty in its 2016 EUR expressly notified the DOAV of the one aspect of the project that was relevant in an EUR submission – whether the project would require a corresponding offset if a discretionary funding request were forthcoming.

2. **Mr. Spirito Only Briefly Delayed Reporting the Loan Guaranty in the PAC's FY2014 Audit Because the Airport Dealt with a New Accounting Rule for the First Time That Year**

The statement that Mr. Spirito delayed reporting the loan guaranty "due to the concern of the loan guaranty being reflected as a potential liability on the airport's financial statements" is literally true but also irrelevant when the government bothers to include the uncontested context of these acts. The PAC in 2014 had to deal with a new accounting standard – referred to as GASB 70 – that required governmental entities for the first time to record liabilities from a loan guaranty of this nature in the year it became more likely than not that the entity would eventually have to pay on the guaranty; that is, entities could no longer wait until the year in which it actually paid the guaranty.

*See* PAC FY2014 Audit, by Dixon Goodman Hughes, at page 15.[9]  In the weeks after PEX

suspended operations in September 2014, the PAC had to determine in good faith at what point it

had become more likely than not that the loan guaranty would become a liability. That chore fell on

Mr. Spirito as Executive Director, but he made the decision, and the liability was disclosed in

November 2014 in the annual PAC audit performed by Dixon Hughes.


3.  **Mr. Spirito Asked the Airport Finance Director to Remove a Reference to an Interest Payment Because It Was Not Relevant to the Report at Hand, a Point to Which the Finance Director Agreed**

Mr. Spirito did  instruct PAC's director of finance to "remove a reference to interest

payments made to TowneBank in a summary provided with the December 2014 financial reports for

the airport." This misleading claim is taken directly from the State VDOT Audit, knowingly omitting

the larger context just like the VDOT Audit did by cropping the relevant email. At the top of the

email chain, Mr. Spirito tells the PAC director of finance to delete a reference to the loan guaranty

interest payment from the summary of her monthly financial statement to the PAC. Left out is the

prior email chain between them. **Exhibit E**.  In the immediately preceding email, the finance director

agrees that she mistakenly included the interest payment in her accounting of the airport's monthly

operating revenues and expenditures and says she will correct it. In his response at the top, Mr.

---

[9] The PAC Audit states: "**Adoption of New Accounting Standards:** In 2014, the Commission adopted Statement of Governmental Accounting Standards (GASB Statement) No. 70, . . . which applies to . . . guarantees of obligations of individuals or legally separate entities in which a guarantor agrees to indemnify a third-party obligation holder under specific conditions.  This Statement requires the government to record a liability when the relevant factors indicate that it is more likely than not that it will be required to make a payment related to the nonexchange financial guarantee.  The Commission was not a guarantor until 2014."

Spirito simply notes that the reference to interest should be removed from the report's summary, as it

did not belong in the operating report to begin with.

### B. Mr. Spirito Took Affirmative Steps to Disclose the Loan Guaranty.

### 1. Mr. Spirito Disclosed the Loan Guaranty to the Daily Press in October 2014 by Providing its Reporter with a Copy of the Vision Air Services Agreement that Openly and Expressly Referred to the Loan Guaranty

On October 3, 2014, Mr. Spirito sent an email to Dave Ress at the Daily Press that stated:

"Dave, attached you will find the Air Service Agreement between the Peninsula Airport Commission

and Vision Airlines.[10] Please direct any questions you may have to either me or Jessica Wharton."

Attached was the referenced Vision Air Services Agreement. **Exhibit F1**.  Three days later, Ress

emailed James Bourey, the PAC chairman, to ask a series of follow-up questions. Among the

questions were:

> The Vision air services agreement does not appear to be a revenue guarantee – any special
> reason why not?
> The Vision agreement doesn't mention a requirement for three planes – any particular
> reason, given its importance?

**Exhibit F2**. Ress's questions clearly indicate that he had read the Vision Air Services Agreement

provided by Mr. Spirito to a level of detail sufficient to notice that it did not mention "a requirement

for three planes" at any point in its text. Having read it that closely, Ress nonetheless apparently

failed to notice the following express references to the loan guaranty in the document:

> 3. Payment of Grant Funds. . . . The remaining One Million Dollars ($1,000,000.00),
> representing the remainder of the SCASD grant and the RAISE contribution, will be retained

---

[10] Vision Airlines was the airlines with which PEX contracted to provide air services.

> in escrow by PAC **until PAC's guaranty under that certain loan (represented by a Letter of Commitment issued to People Express Airlines, Inc. by TowneBank and dated June 6, 2014) (the "Guaranty") is released by TowneBank**. Upon PAC's release from the Guaranty, . . .
> …….
> 4. Term. . . . Vision shall have the right to terminate this Agreement, without further liability to PAC, in the event of (a) a default by People Express Airlines, Inc. under (i) the Letter of Commitment referred to above **or any other circumstance in which PAC is required to make any payment on the Guaranty** or . . . .
> …….
> 9. Remedies Upon Default. . . . **in the event that PAC is called upon to satisfy the Guaranty, the One Million Dollars ($1,000,000.00) held in escrow will be used to satisfy the Guaranty** . . . .

For whatever reason, the Daily Press reporter missed the obvious reference to the loan guaranty given to him by Mr. Spirito over two years before the newspaper dramatically announced that it had uncovered the transaction.

> **2. The PAC Openly Disclosed the Loan Guaranty in both its FY2014 and FY 2015 Audits and Presented the Written Audits at Open Sessions that the Media Did Not Bother to Attend**

The PAC held monthly open sessions at which Mr. Spirito and staff provided a public agenda and various public documents. The media only sporadically attended. For example, on January 22, 2015, the PAC's outside accountants, Dixon Hughes Goodman ("DHG"), gave a public presentation of their annual audit of the PAC's finances. Included in their presentation was the distribution of its written audit report for those who bothered to attend. The Daily Press did not. **Exhibit G**. The DHG public report included the following lengthy paragraphs, the entirety of which expressly discussed the loan guaranty:

> *Financial Operations Highlights*. . . . Nonoperating income (expenses) increased by approximately $4.3 million from 2013, with a net loss of $5.6 million in 2014 compared to a net loss of $1.2 million in 2013. This increase in net loss from nonoperating activity was primarily the result of the Commission recognizing an approximate $4.5 million expense

related to a nonexchange financial guarantee on debt of People Express Airlines. (Emphasis added)(Audit, page 4).

*Long-Term Debt and Loan Guarantees*. . . . Also, in June 2014, the Airport issued a financial guarantee on behalf of People Express Airlines, to guarantee the debt of this company with a local financial institution. The total amount of the debt guaranteed by the Airport was $5 million and the loan is due June 2015, with an interest rate at the bank's prime rate. At June 30, 2014, the Airport estimates it will be required to perform on this loan guarantee and therefore has recorded a liability and corresponding nonoperating expense for the entire amount of the outstanding obligation of $4,454,518. (Emphasis added)(Audit, pages 7-8).

*Guarantee of Debt*. The 1946 Act of Assembly by the Virginia General Assembly, which created the Commission, allows the Commission to extend nonexchange financial guarantees. During June 2014, the Commission guaranteed certain debt of People Express Airlines, Inc. (PEX), a legally separate entity that is headquartered and operating out of the Newport News - Williamsburg International Airport.

In June 2014, the Commission guaranteed PEX's $5 million line of credit with a local financial institution, maturing June 30, 2015, at which time all unpaid advances, accrued and unpaid interest and any other unpaid sums owed will be due and payable in full. The line of credit bears interest at a fluctuating rate per annum equal to the bank's monthly prime rate. At June 30, 2014, the outstanding balance of the guaranteed line of credit is $3,580,190. Subsequent to year end, PEX borrowed the remainder of the available line of credit up to the full limit of the line, $5 million. In the event PEX is unable to make a required payment on the line of credit, the Commission will be required to make that payment. PEX is required to repay the Commission for any payments the Commission makes pursuant to the guarantee, but there is no assurance PEX will be able to repay the Commission if this occurs. If the Commission is required to perform under this guarantee, it will utilize amounts held in escrow of $1 million as required by the guarantee agreement, consisting of unspent contributions received from the RAISE committee (see Note 6) of approximately $700,650 and funds available under the U.S. Department of Transportation's Small Community Air Service Development Program (see Note 5) of approximately $299,350. Also, the Commission is choosing to voluntarily hold in escrow the remainder of the liability with funds provided from the Virginia Department of Aviation of approximately $4,000,000 ($2 million received in 2014 and $2 million expected to be received in fiscal year 2015), to repay the financial institution.

During September 2014, PEX suspended all operations until further notice as a result of having no operable planes available. As of the report date, PEX flights have not commenced again. This suspension has resulted in a shortage of financial resources for PEX as well as a default in the operating agreement with the Commission, requiring a minimum of once-daily scheduled air service. As a result, it is more likely than not that the Commission will be required to pay the remaining portion of PEX's debt service payments based on the guarantee. A liability and expense have been recognized for an amount that is the Commission's best estimate of the discounted present value of the future outflows the Commission expects to incur as a result of the guarantee. The liability recognized for the nonexchange financial guarantee at June 30, 2014 is as follows. . . . $4,454,518. (Audit, page 18-19).

A year later, DHG accountants publicly presented the FY 2015 PAC Audit in similar fashion. Their public written report, made available by Mr. Spirito and staff to the media and public who attended the open session, contained lengthy passages virtually identical to those above. FY2015 PAC Audit, pages 5, 8-12, and 21).

Had a reporter attended the PAC meeting and leafed through the audit report, it would have been near impossible not to have noticed these lengthy passages. Then again, for good measure Airport staff, at Mr. Spirito's direction, emailed these two audits to the Daily Press reporter on November 23, 2016, and again, was met with complete silence from the reporter. Two months later, the newspaper dramatically proclaimed that it had unearthed the loan guaranty through other means.

### 3. Mr. Spirito Made Himself Available to Answer Questions at the PAC's June 9 and June 12, 2014 Public Meetings, but the Local Media Did Not Bother to Attend Either Session

The PAC resolution authorizing its chairperson to pursue the loan guaranty was approved at a special PAC meeting on June 9, 2014 after it went into closed session. Indict. ¶ 24-25. The media did not attend the session. **Exhibit A**. Had a reporter attended, he or she could have asked why the PAC went into closed session and investigated. The PAC then held a regularly scheduled public session only three days later, which the media again did not attend. **Exhibit H1**. The first time the Daily Press appears to have attended a PAC meeting in this time frame was on July 24, 2014, a month after the loan guaranty had been signed. **Exhibit H2**. Of course, three months later, Mr. Spirito disclosed the Vision Air Agreement to the Daily Press reporter, above, and by extension disclosed the underlying loan guaranty.

24

## CONCLUSION

For these reasons, Mr. Spirito moves that Counts 1-17 be dismissed.

.

Respectfully submitted,

KENNETH R. SPIRITO

By        /s/
        Trey R. Kelleter, Esq.
        VSB #41606
        KelleterLaw PC
        409 Duke Street, Suite 100
        Norfolk, Virginia  23510
        Phone & fax: (757) 500-7§ 666
        Email: trey@kelleterlaw.com

## CERTIFICATE OF SERVICE

I certify that on this 27th day of August 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to all counsel of record.

        /s/
        Trey R. Kelleter, Esq.
        VSB #41606
        KelleterLaw PC
        409 Duke Street, Suite 100
        Norfolk, Virginia  23510
        Phone & fax: (757) 500-7§ 666
        Email: trey@kelleterlaw.com