

FILED

JUL 1 0 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**UNITED STATES OF AMERICA**

v.

**CRIMINAL ACTION NO. 4:19-cr-43**

**KENNETH R. SPIRITO,**

     **Defendant.**

### *MEMORANDUM OPINION AND ORDER*

Before the Court is Kenneth R. Spirito's ("Defendant") Motion for Judgment of Acquittal. ECF No. 98.

### I. FACTUAL AND PROCEDURAL HISTORY

From January 4, 2009 through May 15, 2017, Defendant was the Executive Director of the Peninsula Airport Commission ("PAC"), the entity responsible for operating the Newport News/Williamsburg International Airport ("the Airport"). During Defendant's tenure as Executive Director, the PAC experienced major stressors after the Airport's main source of traffic decided to discontinue flights out of Newport News in favor of Norfolk. Hoping to ward off prolonged consequences to the Airport and the surrounding community, Defendant and the PAC Board began to look for ways to increase air traffic into the Airport. In 2014, Defendant enacted a plan for a loan guarantee that benefited People Express Airlines ("PEX"), a fledgling company that was attempting to begin flights out of the Airport. PEX quickly defaulted on the loan and the PAC was left responsible for PEX's obligations to TowneBank. The instant criminal prosecution began as a probe into Defendant's allocation of the PAC funds supporting the loan guarantee, as well as his manipulation of the PAC Board to gain approval for his plan. The

prosecution expanded after scrutiny of Defendant's conduct on the following matters: (1) Defendant's use of PAC credit cards for his own purposes; (2) Defendant's testimony as the plaintiff in a civil case against the PAC after he was terminated from his position as Executive Director; and (3) Defendant's interactions with investigators who were looking into PAC finances during his tenure as Executive Director.

Defendant was named in an eighteen-count Indictment on May 13, 2019 ("Indictment 1"). ECF No. 3. Indictment 1 charged Defendant with Counts 1–11, Misapplication of Property from an Organization Receiving Federal Funds, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 ("the Misapplication Counts"); Counts 12–17, Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. §§ 1957 and 2 ("the Money Laundering Counts"); and Count 18, Falsification of Records in Federal Investigations, in violation of 18 U.S.C. § 1519.

On August 27, 2019, Defendant filed a Motion to Dismiss on Counts 1–17 of Indictment 1 ("Motion to Dismiss 1"). ECF No. 26. On September 9, 2019, the Government obtained a twenty-four-count superseding indictment ("Indictment 2"). ECF No. 29. Indictment 2 maintained Counts 1–18 of Indictment 1, but added Count 19, Conversion of Property from an Organization Receiving Federal Funds, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2("the Conversion Count"); Counts 20–23, Perjury, in violation of 18 U.S.C. § 1623(a); and Count 24, Obstruction of Justice, in violation of 18 U.S.C. § 1503. ECF No. 29. On November 25, 2019, filed a Motion to Dismiss Count 19 of Indictment 2 ("Motion to Dismiss 2"). ECF No. 41. The Court denied Defendant's requested relief in both Motions to Dismiss in an order dated January 13, 2020. ECF No. 48.

Defendant's jury trial began on February 25, 2020 and lasted ten days. ECF Nos. 56–59, 61–64, 68, 84. At the close of the Government's evidence, Defendant moved for a judgment of acquittal on Counts 1–17, 19, and 20–23. ECF No. 63. The Court denied Defendant's motion for a judgment of acquittal on Counts 1–17 and 19 withheld its ruling on Counts 20–23. *Id.* At the conclusion of all the evidence, Defendant renewed his motion for judgment of acquittal on the aforementioned Counts and added an additional motion for judgment of acquittal on Count 24. ECF No. 68. The Court withheld its ruling on Count 24 and maintained its rulings on all other Counts. *Id.* On March 10, 2020, the jury returned the following verdict: guilty on Counts 1–21, 23–24 and not guilty on Count 22. ECF No. 86.

After trial, the period for filing of post-trial motions was extended. ECF No. 97. On April 21, 2020, Defendant timely filed his Motion for Judgment of Acquittal. ECF No. 98. After being granted an extension in time to file its response, the Government responded on May 8, 2020. ECF No. 101. Defendant replied to the Government's response on May 12, 2020. ECF No. 102. Defendant's sentencing is scheduled for July 15, 2020. This matter is ripe for disposition.

## II. LEGAL STANDARD

After the government closes its evidence or after the close of all the evidence, the court may consider whether the evidence presented is sufficient to sustain a conviction. FED. R. CIV. P 29(a). The court may reserve decision on a motion for judgment of acquittal until after the jury renders a verdict. FED. R. CIV. P 29(b). A defendant may renew his or her motion for a judgment of acquittal within 14 days after a guilty verdict. FED. R. CIV. P 29(c)(1).

When reviewing a motion for judgment of acquittal after a guilty verdict, the court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (emphasis in original). This inquiry is a "limited review [that] does not intrude on the jury's role to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id. quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In meeting its burden to prove each of the elements of the crimes of conviction beyond a reasonable doubt, "[t]he government may rely on circumstantial evidence and inferences." *United States v. Rodriguez-Soriano*, 931 F.3d 281, 286 (4th Cir. 2019). Because the jury resolves any conflict between differing reasonable interpretations of the evidence, the court must "assume that the jury resolved all contradictions in testimony in favor of the government" after the jury renders a guilty verdict. *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (*en banc*).

### III. DISCUSSION

Defendant's Motion claims that relief from the guilty verdict against him is proper on Counts 1–18, 19, 20, 21, 23, and 24. ECF No. 98. The Court will address some Counts individually and other Counts collectively as appropriate.

**A. Counts 1–17**

As discussed in the Court's order denying Defendant's Motion to Dismiss, Counts 1–11 (the Misapplication Counts) and Counts 12–17 (the Money Laundering Counts) are inseparable. ECF No. 48 at 7. As a factual matter, it is undisputed that the PAC funds at issue in the Misapplication Counts were involved in monetary transactions, as defined in 18 U.S.C. § 1957, the statutory foundation of the Money Laundering Counts. In seeking acquittal on Counts 1–17, Defendant maintains the following contentions: the use of PAC funds at issue was legal; and Defendant "acted in good faith based on the advice of the PAC's counsel and the informed authorization of his employer." ECF No. 98 at 6–7. The Court also notes that Defendant

4

references previously raised arguments regarding the scope of 18 U.S.C. § 666(a)(1)(A) in seeking acquittal. The Court will address each of these contentions in turn.

*1. The Jury Properly Found Illegal Use of Restricted PAC Funds*

State Entitlement Funds ("SEF") are subject to Virginia state law and the Virginia Department of Aviation ("DOAV"), while airport revenue, Passenger Facilities Charges ("PFC"), Small Community Air Service Development grants ("SCASD"), and Regional Airport Service Enhancement funds ("RAISE") are subject to federal law and the Federal Aviation Administration ("FAA"). As a factual matter, the Government's evidence demonstrated that PAC funds from SEF, airport revenue, PFC, and RAISE were comingled and used to fund a loan guarantee for PEX. Further, the evidence clearly showed that Defendant used bank accounts with misleading titles that inaccurately identified their funding sources to pay on PEX's defaulted loan, transfer money between PAC accounts that were supposed to have defined purposes, and conceal the fallout from PAC payment on the PEX loan guarantee. *See e.g.* ECF No. 109 at 82– 87 (discussing the transfers between restricted PAC accounts ordered by Defendant and his instructions designed to obscure this wrongdoing). In fact, the bank records detailing the transfer of funds between PAC accounts with the foregoing titles was exhaustive and, at times, bordered on cumulative. *Cf.* ECF No. 106 at 164 (documenting the following statement at sidebar: "[t]he Court believes you're putting on cumulative testimony here about the problems they had trying to get People Express going").

Defendant's contention on the legality of using PAC funds from the foregoing restricted sources for the PEX loan guarantee is also deficient. The PAC funds used to guarantee the PEX loan could only be used for the following purposes: SEF for capital projects, PFC for FAA-approved projects, airport revenue for projects benefiting the airport, and SCASD and RAISE

funds as reimbursable grants for air service development *after* the incursion of expenses related to flights operating at a loss. The Government presented overwhelming evidence of the limited purposes for these funds, including testimony from state and federal regulators and regulatory handbooks and materials that were in effect at the time of the PEX loan guarantee. *See e.g.* ECF No. 106 at 121 (confirming that a loan guarantee was *not* an authorized use of federal SCASD funds or the associated RAISE funds). Multiple witnesses also confirmed that Defendant had knowledge of the limited purposes of these funds and the means to resolve any ambiguity about how the funds could be used. *See e.g.* ECF No. 109 at 148 ("[Defendant] said if we had used airport revenue, then we would lose our jobs"). Further, state and federal regulators testified that Defendant concealed incriminating financial transactions from required disclosure documents, which was confirmed by Government exhibits. *See e.g.* ECF No. 107 at 37–38 (documenting that the PAC's use of SEF to for the PEX loan guarantee was not reported to the DOAV in the PAC's required Entitlement Utilization Reports).

The Court previously declined to "examine the machinations of the Virginia legislature" in denying Defendant's motion to dismiss the charges against him at the pretrial stage. ECF No. 48 at 6. Once again, any contention that the use of SEF, airport revenue, PFC, SCASD, and RAISE to fund a loan guarantee was legal at the time the funds were used is still incorrect. State and federal regulators testified in painstaking detail about the approved uses of the funds at issue, operation of the relevant regulations, and the opportunities Defendant had to clarify the boundaries of the regulations. *See e.g.* ECF No. 107 at 26, 38, 44, 46 (confirming that the restricted PAC funds at issue could not be used for a loan guarantee and that SEF were used for the PEX loan guarantee without permission from the DOAV, reporting through Entitlement Utilization Reports, or any appropriate inquiry). Importantly, part of Defendant's wrongdoing

was his intentional mismanagement of the accounts containing restricted funds, effectively comingling state and federal dollars and obscuring a proper accounting of PAC funds from public sources. The fact that the Virginia legislature chose to clarify the permissible uses of SEF (just one of the restricted funding sources at issue) in statute after Defendant's tenure as Executive Director does not absolve him of violating the state and federal regulations in effect at the time of the PEX loan guarantee. It also does not excuse the comingling of public funds in an attempt to float the balance of restricted accounts and obscure the problematic nature of the loan guarantee. In sum, the Court finds no issue with the jury's conclusion that PAC funds from the foregoing sources were improperly used to fund the PEX loan guarantee.

*2. The Jury Properly Found Defendant Responsible for Ordering the Misapplication of Funds*

Defendant's contentions that he "acted in good faith based on the advice of the PAC's counsel and the informed authorization of his employer" are each without merit. The Government presented several witnesses who verified that Defendant knew that restricted PAC funds could not be used to support a loan guarantee but directed the PEX loan guarantee anyway. *See e.g.* ECF No. 109 at 163, 188 (describing Defendant as the "spearhead" for presentations on PAC finances to the PAC Board and explaining that his leadership style created a "very oppressive environment" for the accountant who had concerns about Defendant's directives on PAC finances); ECF No. 111 at 178 (documenting Defendant's attempt to characterize his management of the PAC's SEF as "allowable," instead of eligible or ineligible). Multiple witnesses also testified that the PAC Board relied on the Defendant's expertise to manage the PAC's day-to-day operations, including its finances and funding. *See e.g.* ECF No. 104 at 139–41 (documenting the PAC Board chair's near-total dependence on Defendant at the time of his offense conduct). Further, the jury considered and rejected Defendant's claim that he was simply

relying on the PAC's counsel for cover to justify his use of restricted PAC funds after the Court instructed the jury on this issue. *See* ECF No. 112 at 135–37 (stating the "Reliance on Counsel" jury instruction). In sum, the Government presented adequate evidence to support the jury's conclusion that the Defendant—not the PAC Board, PAC employees, or the PAC's counsel— was responsible for allocating restricted funds for a loan guarantee to PEX. Therefore, Defendant's attempts to shift blame for the loan guarantee to other people affiliated with the PAC provides no basis for overturning the jury's verdict.

*3. Title 18, United States Code, Section 666(a)(1)(A) Covers Defendant's Conduct*

Defendant has repeatedly challenged the conclusion that 18 U.S.C. § 666(a)(1)(A) covers the conduct alleged in Counts 1–19, which was not initiated for his direct personal benefit, but did result in a substantial loss of public funds. *See e.g.* ECF No. 26 at 6 (arguing that a conviction under this section is improper without a showing of "actual theft or schemes that convey a personal benefit to the defendant").

Section 666(a)(1)(A) prevents the "agent of an organization" receiving more than $10,000 of federal funding per year from "intentionally misappl[ying]…property that is valued at $5,000 or more, and is owned by, or is under the care, custody, or control of such organization." To sustain a conviction under this section, a defendant's conduct must result in an actual loss of public funds. *See United States v. Thompson*, 484 F.3d 877, 881–82 (7th Cir. 2007) (invalidating a conviction where no public funds were lost after an official took political considerations into account in awarding a contract); *United States v. Jimenez*, 705 F.3d 1305, 1311 (invalidating a conviction where it was not clear that the defendant directed the misapplication of the funds at issue). Most recently, the United States Supreme Court affirmed that a property fraud application of § 666(a)(1)(A) cannot criminalize all wrongdoing that constitutes "deception, corruption, [or]

abuse of power." *Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020). A conviction for political corruption is not permissible when "implementation costs…[are] an incidental byproduct of their regulatory object." *Id.* at 1565. In short, limitations on the applicability of § 666 focus on prosecutions of officials who are accused of abusing state regulatory power for political motivations.

However, "fraudulent schemes violate [the] law…when…they are 'for obtaining money or property.'" *Id.* at 1572. Nothing in the text of § 666 requires proof of a personal benefit to a defendant to sustain a conviction and there is no case law imposing such a broad limitation. *See Thompson*, 484 F.3d at 883 (disallowing criminal prosecutions for "private gains" that do not result in the loss of public funds). Further, a conviction for a scheme wherein loss of public money or property was "an object of the fraud" is still very much appropriate under § 666. *Kelly*, 140 S. Ct. at 1573. Although "misapplies" is an undefined term, it does cover disbursement in exchange for services not rendered, payment to suppliers who would not have received any contract but for bribes, payment for services that were overpriced to cover the cost of a bribe, or payment for shoddy goods at the price prevailing for high quality goods. *Thompson*, 848 F.3d at 881. It follows that an intentional, unauthorized distribution of public funds to a private entity falls squarely within the meaning of misapplication as found in § 666(a)(1)(A).

In this case, there is no doubt that money was *both* the motive *and* the object of Defendant's misapplication of PAC funds. While Defendant may have believed using PAC funds for a loan guarantee to PEX was in the best interest of PAC, it was the PAC's money that was lost after PEX defaulted on the loan that Defendant ordered to be guaranteed. Of course, this means the PAC was left responsible for paying on the defaulted loan, resulting in a loss of public funds and the inescapable conclusion that the PAC's money was the object of Defendant's

scheme. Further, Defendant's misapplication of restricted PAC funds was not the product of a simple mistake, an interpretive judgment, or a shady political favor. *See Thompson*, 848 F.3d at 881 (rejecting an interpretation of § 666 "that turns all…state law errors or political considerations in state procurement into federal crimes"). Instead, the Government presented evidence that Defendant knew that the loan guarantee was not allowed under state and federal regulations and did it anyway. *See e.g.* ECF No. 109 at 72 ("[Defendant] said that we were going to use $4 million in State entitlements, there was $300,000 in the SCASD grant, and then the $700,000 from RAISE funds"); *id.* at 115 ("Mr. Spirito did not want [information about the loan guarantee divulged]" to state regulators). This sort of intentional disregard for the restrictions attached to public funds is exactly the sort of wrongdoing that § 666(a)(1)(A) is meant to address.

**B. Count 18**

Count 18 charges Defendant with Falsification of Records in Federal Investigations. The relevant statute prohibits the knowing falsification of any record or document with the intent to impede an investigation of a federal agency. 18 U.S.C. § 1519. Defendant's Motion for Judgment of Acquittal absorbs Count 18 into his arguments on Counts 1–17 and raises no independent basis for acquittal. *See* ECF No. 98 at 6–7; ECF No. 102 at 5–6. At trial, the Government's evidence showed that Defendant emailed regulators from the FAA, claiming that "$3,510,642 VA State Entitlements allowable under section 3.1.1.3.2 of the DOAV Airport Program Manual…$299,513.00 U.S. DoT Small Community Air Service Grant…$700,998.00 RAISE contribution" was used to fund the loan guarantee for the benefit of PEX. In fact, Defendant knew that airport revenue and PFC were used to fund the loan guarantee at the time he obscured this fact from FAA investigators. *See e.g.* ECF No. 109 at 148 ("[Defendant] said if

we had used airport revenue, then we would lose our jobs"); *id.* at 148–49 (confirming that airport revenue was, in fact, used to fund the collateral accounts supporting the PEX loan guarantee). Therefore, the Government's evidence is sufficient to sustain a conviction on Count 18.

## C. Count 19

Count 19 charges Defendant with Conversion of Property from an Organization Receiving Federal Funds for his use of a PAC credit card for personal expenses during his tenure as Executive Director. Defendant makes the following arguments in support of acquittal on Count 19: (1) his use of the PAC credit card was an authorized employment benefit; (2) his use of the PAC credit card did not exceed $5,000, as required by § 666(a)(1)(A)(i); and (3) the transactions at issue did not occur within 1 year, as required by the Sixth Circuit in *United States v. Valentine*, 63 F.3d 459 (6th Cir. 1995).

The Court and the jury have already rejected Defendant's contention that his use of a PAC credit card to pay for an extended warranty on his vehicle and vehicle accidents outside of the airport insurance policy was an authorized employment benefit. ECF No. 110 at 76 ("there's some factual issues left here, but there's sufficient evidence in the record for the jury to determine, either by direct evidence or circumstantial evidence, that the Defendant [converted more than $5,000 of PAC property]"). Specific to the issue of the dollar amount of the expenditures at issue, the Government presented evidence that after the termination of Defendant's employment, an audit found $5,800 of unauthorized expenditures on Defendant's PAC-issued credit card. ECF No. 98-2 at 11 (documenting that Defendant reimbursed the PAC with two checks for his unauthorized expenditures, one for $5,000 and another for $800); *see also* ECF No. 110 at 70 (discussing credit card receipts leading to the conclusion that

Defendant's unauthorized expenditures were at least $5,241). Finally, the Court again rejects

Defendant's request to impose a one-year temporal limitation on his conversion of PAC funds.

ECF No. 110 at 69–70 ("the Court is not inclined to follow the Sixth Circuit precedent. The

Fourth Circuit is going to have to set its own precedent on this because the Court has an issue

[here]"). Therefore, Defendant presents no meritorious grounds for acquittal on Count 19.

**D. Counts 20, 21, and 23**

Defendant faces perjury convictions related to his deposition testimony in his civil suit

against the PAC after he was terminated from the position of Executive Director. Count 20

charges Defendant for his sworn statement that he never gave authorization to use airport

revenue for the loan guarantee and told the PAC Board airport revenue could not be used for

such a purpose. Count 21 charges Defendant for claiming that the Board—not the Defendant—

was in full control of the decisions made about the loan guarantee. Count 23 charges Defendant

for denying his role in designing the collateralization schedule for the PEX loan guarantee and

advancing the plan to the PAC Board for approval. The Defendant's perjured testimony can be

found in Indictment 2, was played to the jury during trial, and provided to the jury again in the

Court's Jury Instructions. ECF No. 29, ECF No. 110 at 40–44, and ECF No. 112 at 154–61.

"Whoever under oath…in any proceeding before or ancillary to any court or grand jury of

the United States knowingly makes any false material declaration" shall be guilty of perjury. 18

U.S.C. § 1623(a). A perjurious statement must be "material to the proceeding in which it is

given." *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997). A false statement is material if

it has "a natural tendency to influence, or [is] capable of influencing, the decision of the

decisionmaking body to which it is addressed." *United States v. Gaudin*, 515 U.S. 506, 509

(1995) (internal quotations omitted). The issue of materiality is a mixed issue of law and fact to

12

be decided by the jury in all but the most extraordinary cases. *Id.* at 522–23. The power to prosecute the declarant of materially false statements made in a civil deposition is a critical element of a properly functioning judicial system and is authorized under § 1623(a). *See e.g. In re Sealed Case*, 162 F.3d 670, 673–74 (D.C. Cir. 1998) (discussing Monica Lewinsky's perjured affidavit after she was subpoenaed to testify in a civil case brought against President Clinton by Paula Jones); *United States v. Forde*, 740 F. Supp. 2d 406, 412 (S.D.N.Y. 2010) (holding that a declarant may be prosecuted for perjury if their statement in a civil deposition could influence the decisionmaking body or prevent the discovery of admissible evidence in the underlying suit).

As an initial matter, it is difficult to imagine a scenario wherein a plaintiff provides a materially false response to a relevant and substantive question without subjecting him or herself to perjury. In this particular case, the jury was well aware that Defendant was the plaintiff in a civil suit against the PAC after he was terminated from his position of Executive Director because he testified to this fact himself. ECF No. 111 at 137 ("I was involved in a civil suit…they were going to ask me questions about the People Express loan and the Airport's involvement while *my* civil suit was in federal court."); *see also* ECF No. 110 at 40 (documenting law enforcement's awareness of Defendant's testimony in *Kenneth R. Spirito v. Peninsula Airport Commission*, docketed 4:18cv58). In the same segment of Defendant's direct examination, he confirms that he was the plaintiff and that he was suing the PAC. ECF No. 111 at 137.

Based solely on Defendant's own testimony, the following issues were made plain to the jury: (1) Defendant's testimony in his civil suit against the PAC included claims about the management of restricted PAC funds; (2) Defendant's claims regarding the management of restricted PAC funds were material to his firing from his position as Executive Director; and (3)

the subject of Defendant's civil suit against the PAC was his firing from the position of Executive Director. ECF No. 110 at 40–44 (admitting Defendant's deposition testimony and playing the relevant clips to the jury). Quite simply, materiality is not in question because the jury knew that Defendant's misapplication of PAC funds was relevant to his firing and the issues in his civil case, just as it is relevant to his criminal wrongdoing in this case. Therefore, Defendant's Motion for Judgment of Acquittal on the perjury counts is wholly without merit.

**E. Count 24**

Count 24 charges Defendant with Obstruction of Justice for transmitting a copy of his deposition testimony in his civil case against the PAC "to an investigator with the Virginia State Police…in connection with a federal investigation." ECF No. 29 at 32.

The "Omnibus Clause" of 18 U.S.C. § 1503 prohibits "persons from endeavoring to influence, obstruct, or impede the due administration of justice," which includes a federal grand jury investigation. *United States v. Aguilar*, 515 U.S. 593, 598–99. A conviction for obstruction of justice is not proper without knowledge of a pending proceeding and satisfaction of the "nexus" requirement. *Id.* at 599. In order to satisfy the nexus requirement, the defendant's endeavor must have the natural and probable effect of interfering with the due administration of justice. *Id.* Further, knowledge of a grand jury proceeding or making false statements to an investigating agent are *not* sufficient standing alone to constitute a violation of the Omnibus Clause of § 1503. *Id.* (emphasis added).

A simple examination of the record confirms that federal investigators were not even aware of Defendant's perjured civil testimony until *after* he had already been indicted for misapplying the restricted PAC funds. *Compare* ECF No. 3 (listing the filing date of Indictment 1 as May 13, 2019) *with* ECF No. 29 at 32 (noting that Defendant's perjured civil testimony was

given on May 16, 2019); *see also id.* (filing Indictment 2 on September 9, 2019). In other words, it was impossible for Defendant's perjurious civil testimony on the loan guarantee to have interfered with the federal investigation in the instant case for the following reasons: (1) federal investigators already knew Defendant was lying about the loan guarantee in his civil deposition testimony; and (2) the grand jury had already decided there was probable cause to indict Defendant for Misapplication and Money Laundering anyway. In such a situation, a false statement cannot have "the natural and probable effect of interfering with the due administration of justice" necessary to satisfy the nexus requirement. *See Aguilar*, 515 U.S. at 601 (negating an obstruction conviction wherein the evidence went no further than the defendant testified falsely to an investigating agent). Moreover, Defendant was properly convicted for perjury for his false deposition testimony in his civil case against the PAC. *Id.* at 601 ("testif[ying] falsely to an investigating agent...all but assures that the grand jury will consider the material in its deliberations"); *see supra* Part III.D. (affirming Defendant's convictions for perjury that were brought forth by a grand jury in Indictment 2). The Government's attempt to tack on an additional obstruction charge in addition to the perjury counts is not supported by precedent as a legal matter and unnecessarily duplicative as a practical matter. Therefore, Defendant's Motion for Judgment of Acquittal on Count 24 is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment of Acquittal is **DENIED** on Counts 1–21 and 23 and **GRANTED** on Count 24. The Court **DIRECTS** the Clerk to provide a copy of this Order to the parties.

**IT IS SO ORDERED.**

Newport News, Virginia
July 10, 2020

Raymond A. Jackson
**United States District Judge**